IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DARRELL WAYNE WISE                                                    PLAINTIFF

v.                          Civil No. 05-2132

MICHAEL OGLESBY;
LARRY CLARK; WAYNE
THOMPSON; BILLY RYAN;
TOMMY HUBBARD; and
LEONARD LAWLER                                                       DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the undersigned for report and recommendation are the defendants' motions for

summary judgment motion (Doc. 26 and Doc. 30).  To assist plaintiff in responding to the

summary judgment motion, a questionnaire was propounded to the plaintiff  (Doc. 36).

Plaintiff's response to the questionnaire was filed as his response to the summary judgment

motions (Doc. 40).

Plaintiff contends his constitutional rights were violated in the following ways during his

arrest in Mena, Arkansas, booking into, and incarceration at, the Polk County Detention Center:

(1) excessive force was used against him; (2) he was deprived of his property; (3) he was denied

adequate medical care; (4) he was denied access to a meaningful grievance procedure and/or

legal materials; and (5) he was retaliated against because he filed numerous grievances and/or

requested medical care.

-1-

## BACKGROUND

On October 30, 2003, Darrell Wayne Wise was treated at the Palo Pinto General Hospital in Mineral Wells, Texas. *Plaintiff's Response* (Doc. 40) (hereinafter *Resp.*) at ¶ 1. Wise reported he had an accident the prior week when he was roofing and fell off. *Id.* at ¶ 2. He complained of pain in both ankles and swelling of both feet. *Id.*

Wise was diagnosed with a fracture of both calcaneus (heel) bones. *Polk County Defendants'* [1] *Exhibit* 1 at page 17; *Resp.* at ¶ 3. He was discharged with a prescription for Lortab, told to use a wheelchair and not be weight bearing, to see Dr. Rose on Monday or Tuesday, to follow-up with a private doctor, or to return to the emergency room as needed. *Id.*

Wise did not see Dr. Rose or have any other formal medical treatment following his hospital visit. *Resp.* at ¶ 4. Instead, Wise treated himself by taking over-the-counter Tylenol and remained in the wheelchair due to swollen painful feet. *Id.* Wise also took photographs of his heels in late November or early December. *Id.*

Leonard Lawler is an officer with the Mena Police Department. *Resp.* at ¶ 5(A). Tommy Hubbard is the Chief of Police for the Mena Police Department. *Id.* at ¶ 5(B).

On February 2, 2004, Melissa Turpin reported that Wise had put a knife to her face, slapped her several times, took all of her money, and stole her vehicle. *Resp.* at ¶ 6(A). Turpin made a statement to the police on February 2, 2004, in which she stated Wise took her money (close to $900), her car, and poked her on the nose with the point of a knife. *Id.* at ¶ 6(B).

---

[1]The court will refer to Michael Oglesby, Larry Clark, Wayne Thompson, and Billy Ryan as the "Polk County Defendants." The exhibits they submitted with their summary judgment motion (Doc. 26) will be referred to as the "Polk County Defendants' Exhibits." The court will refer to the exhibits submitted with the summary judgment motion (Doc. 30) filed by Tommy Hubbard and Leonard Lawler as "Hubbard's Exhibits."

AO72A
(Rev. 8/82)

At about 1:05 p.m. on February 2, 2004, Assistant Chief Gibson, of the Mena Police Department, attempted to stop the vehicle Wise was driving at the intersection of Highway 8 and Highway 375. *Resp.* at ¶ 7. Wise refused to stop and took off driving westbound on Highway 375. *Id.* at ¶ 8. Wise turned into a driveway located at 1710 Highway 375. *Id.* at ¶ 9. He continued across the yard and onto an old road in the woods behind Pioneer Thrift Shop. *Id.*

Wise fled on foot and was spotted running across Highway 71. *Resp.* at ¶ 10(A). Upon running towards the railroad bank, Wise asserts he twisted and fell re-injuring his heels. *Id.* When he got up, Wise states he was limping and made it as far as Cole Street where he was spotted by an officer who was pursuing him. *Id.* At this point, Wise states he decided it was best to "give up." Wise was arrested and charged with aggravated robbery, fleeing, possession of instruments of crime (burglary tools), possession of marijuana, carrying a knife as a weapon, and possession of drug paraphernalia. *Resp.* at ¶ 10(B); *Hubbard's Exhibit* A-4.

Lawler took custody of Wise and conducted a search incident to the arrest. *Resp.* at ¶ 11(A). According to Lawler, at the time of the arrest, Wise was not visibly injured or visibly limping. *Hubbard's Ex*. A, affidavit of Lawler, at ¶ 5.

Wise, however, states he was in pain from his heels when Lawler searched him. *Resp.* at ¶ 11(B). Moreover, he states he advised Lawler four or five times that he had just "come off a wheelchair for broken heels" and needed to see a doctor. *Id.* Moreover, Wise states he "was not walking adequately towards the squad car." *Id.* Finally, Wise notes that Lawler's affidavit was made more than two years after the incident occurred. *Id.*

During the search of Wise, among other things, Lawler found what he indicated was a switch blade knife. *Hubbard's Ex*. A-5. Wise, however, states he had a small lighter for his

cigarettes that had a fruit peeler of approximately two inches. *Resp.* at ¶ 12(A). Lawler confiscated $819.80 in cash from Wise. *Resp.* at ¶ 12(B).

Lawler transported Wise to the Polk County Detention Center (PCDC). *Resp.* at ¶ 13. According to Lawler, as they approached the PCDC, Wise stated that his feet hurt. *Hubbard's Ex.* A, affidavit of Lawler, at ¶ 7. Lawler asserts Wise never requested medical attention in Lawler's presence. *Id.* at ¶ 8.

Wise disagrees. *Resp.* at ¶ 14 & ¶ 15. Wise maintains he had told Lawler he was in pain four or five times during the search, once or twice during the transportation, and again while Lawler was in the process of turning Wise over to personnel inside the PCDC. *Resp.* at ¶ 14.

Turpin signed a property release authorization form which stated under penalty of perjury that she was the rightful owner of the money found on Wise. *Resp.* at ¶ 16(A). The money was returned to Turpin on February 2, 2004. *Id.* at ¶ 16(B).

On February 2, 2004, Wise identified himself as Darrell Reed. *Resp.* at ¶ 17. Wise was transported to the Garland County Detention Center and identified the next day as Darrell Wayne Wise. *Id.* at ¶ 18(A). Wise stated he was wanted in Texas and that was why he gave a false name. *Id.*

Before he was taken to the Garland County Detention Center, Wise was agitated and uncooperative. *Hubbard's Ex.* B at ¶ 5. *See also Resp.* at ¶ 18(B) ("I am sure of being disturbed and irritated."). According to Hubbard, Wise kept kicking the cage in the vehicle and screaming. *Hubbard's Ex.* B at ¶ 5. Hubbard states he instructed Wise to get out of the car. *Id.* at ¶ 6. When Wise refused, Hubbard grabbed Wise by the collar and sat him down in the seat while

-4-

instructing him to calm down. *Id.* at ¶ 7 & ¶ 8. Hubbard asserts he did not hit or strike Wise during the encounter or at any other time. *Id.* at ¶ 9 & ¶ 10.

Lawler believed Wise was under the influence of methamphetamine. *Hubbard's Ex.* A, affidavit of Lawler, at ¶ 15. Wise maintains he was not under the influence of any drugs. *Resp.* at ¶ 18(I). Instead, he states he was merely under the influence of shocking pain. *Id.* Wise also notes there is no mention of his being under the influence of any drugs on his booking or arrest report and no indication he was given any type of test for drugs, placed in a detoxification room, or taken to a doctor as a result of the use of drugs. *Id.*

Wise maintains he did not kick the cage. *Resp.* at ¶ 18(B). Instead he states he kept telling Lawler he needed to see a doctor. *Id.* In response, Wise states he was told he would be taken to see someone after the identification process. *Id.*

When they returned to the PCDC after Wise had been identified, Wise maintains Hubbard screamed at him "to stop causing trouble and get the f— out of the car, now!" *Resp.* at ¶ 18(D). Wise states he was agitated, disturbed, and to a small degree rude for two reasons. *Id.* at ¶ 18(D), ¶ 18(G) & ¶ 18(H). First, Wise states he could not move as fast as Hubbard wanted Wise to because he was being careful not to bump his lower legs into the seat or car door. *Id.* Second, Wise states he was agitated and disturbed from his pain and kept persistently arguing with, or being obnoxious with, Lawler about Wise's need for medical help for his broken heels. *Id.* Wise maintains he could not properly cooperate because of the pain and his need for medical help. *Id.* Furthermore, Wise states he had been told he could not get medical help until he was properly identified. *Id.* at ¶ 18(H). This prompted him to confess he was wanted in Texas because "the pain was unbearable I had to do so in order to end up getting medical help." *Id.*

Wise maintains Hubbard never attempted to calm Wise down and instead grabbed him by the hair and began delivering closed fisted blows to his face and chest area. *Id.* at ¶ 18(D) & ¶ 18(E). Wise states he never resisted Hubbard's commands and was in fact in handcuffs. *Id.* at ¶ 18(G). Wise maintains Hubbard hit him six or so times –but no more than ten–in Wise's face, nose, mouth, jaw, and chest area. *Id.* at ¶ 18(F).

Wise also offers what he refers to as an affidavit/letter of Ronald Pezzuti to support his version of the events. *Plaintiff's Ex.* A, Part 1, at page 19. This document is a handwritten statement allegedly by Pezzuti in which he states he witnessed Hubbard swing on a prisoner in the back of the patrol car and land five or six good blows to the upper chest and face. *Id.* Pezzuti indicates he later knew the prisoner as Wise. *Id.* The statement is not notarized or sworn to under penalty of perjury. *Id.*

As a result of the use of force, Wise contends he sustained a busted lip, about four small cuts from his teeth, swelling, a lemon sized bruise in the collarbone mid-chest area, and a bruise on the top bridge of his nose. *Resp.* at ¶ 18(G). Wise also maintains he was dizzy and suffered from blurred vision at that moment. *Id.* Finally, Wise indicates he had a sore jaw that hurt unbearably and caused his head to throb for days. *Id.* Wise also indicates he could hardly sleep and lived in dread and trembled as if he was cold at the sound Hubbard's name. *Id.* Wise indicates it took months for him to heal completely from the injuries. *Id.*

On February 4, 2004, Wise completed a medical questionnaire and indicated he had problems with arthritis and two broken heels. *Resp.* at ¶ 20. A notation on the medical history portion of the medical questionnaire states: "leave his shoes with him in cell per judge." *Polk County Defts' Ex.* 2 at page 10. However, Wise maintains tennis shoes were not given to him

-6-

until March 12, 2004, when he was treated by Dr. Sessler who ordered the jailers to give him the opportunity to wear them. *Resp.* at ¶ 21.

On February 8, 2006, Wise requested medical attention because of his two broken heels. *Polk County Defts' Ex.* 2 at page 13. He indicated he had the problem with his heels for four weeks. *Id.* Wise indicates he meant to say he had the problem "for a week" but made a mistake and said four weeks because the pain he was in took away his concentration. *Resp.* at ¶ 22. Wise maintains he received no medical care in response to this request. *Resp.* at ¶ 24.

On February 16, 2006, Wise requested medical attention because his right leg had sharp pain shooting up to his thigh. *Polk County Defts' Ex.* 2 at page 14. Wise stated he could not walk on the cement because of the pain. *Id.*; *Resp.* at ¶ 26. He indicated he had the problem for two weeks. *Id.* Wise indicates he did not receive any medical treatment in response to this request. *Resp.* at ¶ 27.

Wise was asked to explain why he didn't mention his broken heels in the request. *Resp.* at ¶ 28. Wise states he had been constantly telling the defendants about his broken heels since his arrest and even mentioned it on the medical questionnaire completed when he was booked in. *Id.* Given this, Wise states he could not imagine that they did not know what he was talking about. *Id.*

On February 16, 2004, Wise complained that he had submitted five medical requests because both of his heels were broken. *Resp.* at ¶ 29. He stated that he had not been seen by a doctor. *Id.*

On February 27, 2004, Wise submitted a grievance stating that Larry Clark had denied him medical care on a number of occasions. *Resp.* at ¶ 32. Wise indicated Clark said the PCDC did not have the money to take Wise to the hospital. *Id.*

Wise never mentioned a busted lip or the use of excessive force by Hubbard in any medical request he submitted or in any grievance. *Polk County Defts' Ex.* 2. Wise, however, states he did "vaguely describe the attack and mention[]" that he "was beat up by Polk County Officers." *Resp.* at ¶ 19. The document Wise refers to is a grievance dated February 27, 2004. *Polk County Defts' Ex.* 2 at page 19. The document states in relevant part: "Larry Clark has on a number of occasions denied Darrell Wise medical care. I have 2 broke heels and upon my arrest I was beat-up by Polk County Officers and Trusty Inmate Rudy and the Black Trustee James." *Id.* Wise indicates at the time he was not sure who Hubbard and Lawler worked for and was under the impression they worked at the PCDC. *Resp.* at ¶ 19.

Wise maintains his February 27th grievance was referring to two separate beatings. *Resp.* at ¶ 34. The first beating was the one involving Hubbard and Lawler and occurred on February 3, 2004. *Id.* Wise submitted no grievances regarding this beating prior to this February 27th grievance but states he did tell Michael Oglesby in court about it. *Id.*

The second beating, according to Wise, involved Jailer Billy Ryan and two trustees, Rudy Standridge and James Andre Roots. *Resp.* at ¶ 34 & ¶ 33. Wise indicates this beating occurred on February 8th. *Id.* at ¶ 34. Wise states he was arguing with Ryan about Wise not being provided medical help. *Id.* Ryan then told Wise he had no rights, tore up his grievances, and stated he was going to show Wise how "we do things around here." *Id.* Ryan then left reappearing shortly after with two inmates. *Id.* Wise asserts he was knocked out by the inmates.

-8-

*Id.* After Wise was knocked out, he asserts he quickly got to his feet despite the pain, and fought for his life. *Id.* Wise indicates another inmate named Fisher jumped in to assist Wise and it ended up in a brawl. *Id.* Wise indicates Ryan then "sprayed" Fisher and Wise all over the face, eyes, and mouth area. *Id.* at ¶ 34.

Wise indicates he suffered pain all over his body as a result of this incident but mostly in his feet. *Resp.* at ¶ 34. Following the incident, Wise asserts the pain in his feet was so bad he had to lay in bed. *Id.* Wise maintains the chemical agent used also aggravated the nose problems he had from the prior attack by Hubbard. *Id.* Wise states he had nose bleeds, blurred vision, headaches, a sore jaw, a sore finger, and shortness of breath. *Id.*

Wise contends he submitted written requests for medical treatment for his broken heels from the first day he was locked up although not all these requests appear in the summary judgment record. *Resp.* at ¶ 31. Wise states he was not provided copies of these documents at the time and had no means of making copies. *Id.* Wise indicates he also requested medical treatment through his attorney, calls from his family, calls from the offices of Mrs. Kay Bailey Hutcheson and Mrs. Arlene Warhowl, by asking Judge Looney, and by asking every officer he saw. *Id.* at ¶ 25 & ¶ 31.

According to Wise, Ryan, Clark, Thompson, and occasionally Oglesby, would tell Wise that he was faking it and that he didn't have any rights there and that is what he got for fleeing. *Resp.* at ¶ 30. Although he was in severe pain, Wise maintains all his medical requests and grievances were unanswered until the fortieth day of his incarceration. *Id.*

On March 2, 2004, Wise signed a consent to outpatient treatment form for Healthy Connections, Western Arkansas Total Community Health. *Polk County Defts' Ex.* 2 at page 20;

*Resp.* at ¶ 37.  On a Western Arkansas Total Community Health questionnaire Wise indicated he had problems with nervousness, drug addition, IV drug use, painful joints, and arthritis.  *Polk County Defts' Ex.* 2 at page 22; *Resp.* at ¶ 38.  Wise notes there was no "broken bones slot" on the questionnaire.  *Resp.* at ¶ 38.

On March 10, 2004, Randy Rainwater, Wise's public defender, wrote a letter to Larry Clark, Chief Jailer at the PCDC, confirming that Rainwater had spoken to Clark twice regarding Wise's need for medical care.  *Resp.* at ¶ 40.  On March 10, 2004, Wise complained that he needed access to the law library and was being denied due process.  *Resp.* at ¶ 41.

On March 12th Wise was treated by Dr. Sessler.  *Resp.* at ¶ 42.  Dr. Sessler noted that Wise's history was significant for jumping off a 30 or so foot high cliff in an attempt to avoid law enforcement officers in mid-October in Texas.  *Id.* at ¶ 43.  Dr. Sessler noted that Wise had hobbled around for about ten days and then saw a doctor who provided pain medication and suggested seeing an orthopedic specialist.  *Id.*

Wise did not see an orthopedic specialist and told Dr. Sessler that he had re-injured his feet in February when he was arrested.  *Resp.* at ¶ 44.  Dr. Sessler was unable to x-ray Wise's feet but noted that he had very flat feet, tenderness with no palpable deformity through the sole of the feet, and some hyperemia in the ankles.  *Polk County Defts' Ex.* 2 at page 27; *Resp.* at ¶ 45.  Dr. Sessler indicated he would confirm the existence of fractures, approximately five months old, when an x-ray was available the following week.  *Resp.* at ¶ 46.  He prescribed Lorcet to be taken at nighttime and may repeat in four hours and Bextra to be taken once daily with food.  *Id.*  Dr. Sessler also indicated Wise should not do any prolonged standing and could wear shoes but

-10-

without laces. *Polk County Defts' Ex.* 2 at page 32; *Resp.* at 46. Wise was to return to see Dr.

Sessler in six weeks. *Polk County Defts' Ex.* 2 at pages 27 & 32; *Resp.* at ¶ 46.

Wise asserts he tried to address the fact that he was to return for x-rays the following

week and then follow-up treatment in six weeks with defendants. *Resp.* at ¶ 46. However, Wise

states they chose to simply ignore his questions about when he was to go back and did not

inquire about whether he was to return for an x-ray the following week. *Id.* Wise does not know

whether Dr. Sessler would have ordered different treatment based on the x-ray. *Id.*

With respect to the prescribed medication, Wise states the prescription contained fifteen

pills. *Resp.* at ¶ 49. Wise indicates he received only thirteen of the prescribed pills because

Ryan twice forgot to give him the prescribed medication. *Id.*

On March 13th Wise complained that he had not been given bed sheets, his plastic mat

had not been disinfected, he was only allowed to shower every three days, there was only one

deodorant for all inmates to share, and when a razor was brought it was not new but was instead

one that had been boiled in hot water. *Resp.* at ¶ 49.

On April 6, 2004, Wise was released by Wayne Thompson to TransCor for transfer to

prison. *Resp.* at ¶ 50. He was booked into the Texas Department of Correction on April 8, 2004.

*Id.* at ¶ 51.

Wise was seen at the Texas Department of Correction Clinic on April 12, 2004, and

complained of bilateral fractured heels that had occurred in November. *Polk County Defts' Ex.*

3 at page 4. Wise indicates he either stated that the fractured heels occurred in November by

mistake or he was simply misquoted by the nurse who wrote the clinic notes on April 12th.

*Resp.* at ¶ 52.

-11-

Wise stated his medical shoes had been taken and that he had been taking strong pain medication while in Polk County. *Resp.* at ¶ 53. When Wise said his medical shoes, he meant the shoes Dr. Sessler allowed him to have on March 12, 2004. *Id.* at ¶ 54. Wise maintains these shoes were taken from his twice. The first time by Clark on March 17th. *Id.* Wise indicates he had made it known on March 17th that he was going to learn the law to take the defendants to court for not giving him medical attention for forty days. *Id.* The second time the shoes were taken was when he was entering the Texas Department of Correction. *Id.*

Wise was asked to describe in detail how Michael Oglesby violated his federal constitutional rights. *Resp.* at ¶ 55. Wise responded that since the first day of his incarceration at the PCDC he submitted both grievances and medical requests for help regarding his broken heels, numb feet, severe pain, attacks by officers and inmates, life threats, law library requests, no bed sheets, unsanitary conditions such as being provided used razors and un-disinfected mattresses, one deodorant for all inmates, parties with sexual acts involving both inmates and officers, staff with liquor involvement and more. *Id.* Despite this, Wise states Oglesby did not review, answer, or even inquire into these matters. *Id.* Wise indicates he asked for Oglesby's assistance on three separate occasions in court. *Id.*

Wise maintains untrained jail personnel were allowed to evaluate requests for medical care and the PCDC had no means of providing medical care to inmates. *Resp.* at ¶ 55. Wise also asserts there should have been some procedure for handling grievances against the chief jailer Larry Clark. *Id.* Had there been some kind of review, Wise maintains Oglesby would have known there were problems in the jail that needed to be immediately addressed. *Id.*

-12-

Wise was asked to describe in detail how Larry Clark violated his federal constitutional rights. *Resp.* at ¶ 56. Wise maintains Clark ignored his repeated requests for medical care and retaliated against him for writing grievances. *Id.* Specifically, Wise maintains Clark retaliated against Wise by threatening his life, taking away his doctor ordered shoes, telling other officers to take away Wise's writing paper, placing Wise on lock-down, and denying Wise access to a law library so he could not learn to file a complaint. *Id.*

Wise was asked to describe in detail how Wayne Thompson violated his federal constitutional rights. *Resp.* at ¶ 57. Wise indicates Thompson booked him in and ignored Wise's complaints about his broken heels and severe pain. *Id.* Wise also indicates he gave Thompson some medical requests that are for some reason not part of the record. *Id.* Wise maintains Thompson participated in "Clark's plot" to take all writing materials from Wise's cell block because he was "grieving" about problems at the PCDC. *Id.*

Wise was asked to describe in detail how Ryan violated his federal constitutional rights. *Resp.* at ¶ 58. Wise maintains that during his incarceration at the PCDC he told Ryan numerous times about his severe pain and that he needed to see a doctor. *Id.* Once medication was prescribed, Wise maintains Ryan purposely chose not to provide Wise with the medication ordered by the doctor. *Id.*

Wise also maintains Ryan would not provide him with grievances or medical requests and on one occasion tore one up that he had given Wise. *Resp.* at ¶ 58. Wise asserts Ryan condoned and encouraged and attack on Wise by fellow inmates. *Id.* Further, Wise states Ryan utilized chemical spray against Wise for a fight Ryan started. *Id.*

-13-

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he or she violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). Mere negligence will not suffice to state a claim

-14-

for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Defendants have moved for summary judgment on all of plaintiff's claims except the retaliation claim. We will address each claim separately.

### Excessive Force

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Wise was a pretrial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

-15-

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Hubbard and Wise give contradictory versions of what occurred during the alleged use of force. Hubbard states he simply used the amount of force reasonably necessary to calm down Wise and remove him from the car. Wise concedes he was not moving as quickly as Hubbard would have liked and was being to some extent rude and obnoxious in demanding medical care. Given this, some amount of force was certainly reasonable to remove Wise from the car. *Cf. Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006)("[B]ecause some force was reasonably required to arrest and handcuff [the plaintiff], his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support the conclusion that [the officer] did not use excessive force."); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990)(When an arrestee flees or resists, some use of force by the police is reasonable).

-16-

Whether or not Hubbard did strike Wise, we believe the de minimis nature of the injuries suffered by Wise preclude his excessive force claim. *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005)("Although we have remarked that it remains an open question in this circuit whether an excessive force claim requires some minimum level of injury, we have also held that a de minimis use of force or injury is insufficient to support a finding of a constitutional violation. . . . In this case, Andrews alleges at most very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions [pain flare-up relating to pre-existing neck and back conditions that left Andrews with a sore neck and horrible headache]. These are precisely the type of de minimis injuries that preclude a claim for excessive force.")(citations and internal quotation marks omitted). Wise indicates he suffered a small cut on his lip, a few bruises, and contusion to his nose. Wise did not report any of these injuries on the medical questionnaire that was completed when he was booked in. Although he sought medical care for his broken heels and filed grievances regarding other matters, there is no mention in any of the documents about the injuries he allegedly suffered at the hands of Hubbard. *See Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003)("An 'actual injury' must be shown to support an excessive force claim under the Fourth Amendment.")(citation omitted). We believe Hubbard is entitled to summary judgment on this claim. As the claim against Lawler is based on his failure to intervene during the use of excessive force by Hubbard, we conclude Lawler is also entitled to summary judgment on this claim.

Wise's second excessive force claim is against Ryan and is based on his alleged use of a chemical agent against Wise. Courts, including the Eighth Circuit, have concluded that "a

-17-

limited application of [non-lethal chemical agent] to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000)(discussing cases from a number of jurisdictions holding the use of chemical agents did not constitute cruel and unusual punishment if reasonably necessary to maintain security and order or subdue a recalcitrant prisoner). *But see Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006)("An application of pepper spray when an inmate is being compliant can provide a basis for an Eighth Amendment claim."). The Eighth Circuit also noted that when "[u]sed in such manner and purpose, its application should 'rarely be a proper basis for judicial oversight.'" *Jones*, 207 F.3d at 496.

In this case, Wise contends on February 8, 2004, after he exchanged words with Ryan, Ryan let two inmates, James and Rudy, into the cell with Wise and the two inmates proceeded to attack Wise. During the attack, another inmate, Fisher jumped into the fight. At that point, Wise maintains Ryan sprayed Fisher and Wise with mace and told them they better stop making trouble.

No medical requests or grievances mention the use of mace by Ryan. When Wise was seen by the doctor on March 12th, there is no mention in the doctor's narrative regarding Wise's medical history about the attack, the alleged use of excessive force, or the use of mace, although there is mention of the fact that Wise's father and sister have emphysema. The only reference to the alleged attack by the other inmates is in a grievance dated February 27th. This grievance states in relevant part: "I was beat-up by Polk County Officers and Trusty Inmate Rudy and the Black Trustee James." *Polk County Defts' Ex.* 2 at page 19. Ryan is not referred to by name. In responding to the summary judgment motion, Wise now contends he used the term "Polk

-18-

County Officers" to mean Hubbard, Lawler, and Ryan and that this grievance covered the beating that occurred on February 4th and February 8th.

Assuming for purposes of this motion that Wise was sprayed with mace or some type of chemical agent on February 8th, his claim fails because application of the spray was reasonable under the circumstances Wise concedes existed when the spray was used.  According to Wise, at the time the spray was used James, Rudy, Fisher, and Wise were all fighting.

Even if the application of the spray was not reasonable under the circumstances, the claim nevertheless fails because Wise suffered only a de minimis injury as a result of the administration of the spray.  Wise does not indicate there were any lingering effects of the spray.

We note that Wise maintains numerous actions taken by Ryan, including his allowed inmates James and Rudy into the cell, and other actions taken by the Polk County defendants were in retaliation for Wise's submission of grievances, for requesting medical care, and causing trouble.  As noted above, the Polk County defendants' summary judgment motion does not address the retaliation claim.

### *Deprivation of Property*

Wise's claims that Lawler improperly released his funds are subject to dismissal.  The funds were released to Turpin after she submitted a written statement and signed, under penalty of perjury, the property release authorization stating she was the rightful owner of the money and cigarettes.  *Resp.* at ¶ 16(A) & ¶ 16(B).

Even if the property was wrongfully taken from Wise, no claim of constitutional dimension is stated.  The United States Supreme Court has held that neither the negligent nor

-19-

intentional random or unauthorized deprivations of property under color of state law are actionable where a plaintiff has an adequate state post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994)(negligent or intentional deprivation of prisoner's property fails to state claim under § 1983 if state has adequate post-deprivation remedy). Arkansas law recognizes a cause of action for conversion when property is wrongfully taken from its owner. *Elliot v. Hurst*, 307 Ark. 134, 817 S.W.2d 877, 880 (1991)(cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right).

### Denial of Adequate Medical Care

During his incarceration at the PCDC, Wise was a pretrial detainee. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429

-20-

U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86

-21-

F.3d 761, 765 (8th Cir. 1996).   In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the

Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to
> receive a particular or requested course of treatment, and prison doctors remain
> free to exercise their independent medical judgment. Deliberate indifference may
> be demonstrated by prison guards who intentionally deny or delay access to
> medical care or intentionally interfere with prescribed treatment, or by prison
> doctors who fail to respond to prisoner's serious medical needs.  *See Estelle v.*
> *Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  Mere
> negligence or medical malpractice, however, are insufficient to rise to a
> constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239.  *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Wise contends as soon as he was taken into custody at the PCDC he began

requesting medical treatment for his heels.  He asserts all the Polk County defendants were

advised that he had previously broken his heels and needed medical attention because he had re-

injured his heels.  The medical questionnaire completed during the booking procedure indicates

he had two broken heels. *Polk County Defts' Ex.* 2 at page 10.  Wise requested medical attention

for his broken heels on February 8th and for sharp pain in his right leg and because he couldn't

walk on the cement because of the pain on February 16th. *Polk County Defts' Ex.* 2 at page 13,

page 14.  On February 16th Wise submitted a grievance stating he had filed out medical requests

on five different occasions asking for medication attention because of his two broken heels. *Polk*

*County Defts' Ex.* 2 at page 15.  On February 27th he submitted another grievance indicating he

had requested medical care on a number of occasions because of two broken heels. *Polk County*

*Defts' Ex.* 2 at page 19.  On March 10, 2004, Wise's attorney, Randy Rainwater, submitted a

letter to the chief jailer, Larry Clark, noting that Rainwater had spoken to Clark on at least two occasions regarding Wise's need for medical care. *Polk County Defts' Ex.* 2 at page 25.

Although Wise completed a consent to treatment form on March 2, 2004, *Polk County Defts' Ex.* 2 at page 20, it does not appear he was seen by medical personnel until March 12, 2004, when Wise was seen by Dr. Sessler, *Polk County Defts' Ex.* 2 at page 27.   After Wise was seen, the medication prescribed was obtained. *See e.g., Polk County Defts' Ex.* 2 at page 33.

Given the fact that more than a month elapsed between his first requests for medical care and Wise's  being seen by medical personnel, we believe there are genuine issues of fact as to whether the Polk County defendants were deliberately indifferent to his serious medical needs. Nothing before the court establishes that Wise's requests for medical care were evaluated by medical personnel or a determination was made that his medical condition was not serious. Rather, it appears quite simply that nothing was done in response to Wise's requests for medical treatment until after Wise's attorney reduced his concerns to writing and submitted it to the chief jailer.  While a lapse of time in addressing medical requests may not alone be sufficient to create a genuine issue of fact, here we have a detainee who submitted medical requests asserting that he was in severe pain due to broken heels.  We have been provided with no information, by means of affidavit, or otherwise, on how his medical requests were evaluated or how a determination was made that he did not need medical treatment prior to March 12th.

### *Denial of Access to an Adequate Grievance Procedure and/or Legal Materials*

Wise contends his grievances were not handled properly, he could not always get grievance forms, he did not always receive responses to his grievances, and he did not get copies of his grievances.  However, he has not identified a federal constitutional right that he was

-23-

deprived of because of the alleged inadequacies in the PCDC's grievance procedures. He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because of his exercise of his First Amendment rights, or that his ability to exercise any specific constitutional right was chilled by defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted). *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Blagman*, 112 F. Supp. 2d at 542 (*citing, Scott v. Kelly*, 107 F. Supp. 2d 706 (E.D. Va. 2000), *aff'd*, 6 Fed. Appx. 187 (4th Cir. 2001)). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV. 2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).

Wise also alleges his request to use the law library was denied because he had a public defender appointed on his criminal case. "Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir.

-24-

1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996);

*Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)).   In

*Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail.  Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.  To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims.  Alleging theoretical inadequacies is insufficient.  Inmates must instead show, for example, that a complaint they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

 In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the

Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and

*Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right

of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally

attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it

does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'"

*Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

 In this case, Wise's claim fails because he has suffered no actual injury.  Wise was able

to communicate with relatives and his attorney and to send and receive mail.  Wise has not

identified a single deadline he missed with a court or a claim he was precluded from pursuing

because of his incarceration at the PCDC.  *See Klinger v. Department of Corrections*, 107 F.3d

-25-

609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).

Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Wise's allegations are insufficient as a matter of law.

## CONCLUSION

For the reasons stated, I recommend the motion for summary judgment filed by separate defendants Tommy Hubbard and Leonard Lawler (Doc. 30) be granted. This would dismiss all claims against these two defendants.

I further recommend the motion for summary judgment (Doc. 26) filed by Michael Oglesby, Larry Clark, Wayne Thompson, and Billy Ryan (the Polk County Defendants) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to the following claims: (1) plaintiff's claim that excessive force was used against him by Billy Ryan; and (2) plaintiff's claim that he was denied an adequate grievance procedure and/or access to legal materials or a law library. I recommend the motion be denied with respect to the plaintiff's claim that the Polk County defendants denied him adequate medical care. The Polk County defendants' motion for summary judgment did not address the plaintiff's claim that they retaliated against him because he submitted grievances and/or requested medical care.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

-26-

**objections may result in waiver of the right to appeal questions of fact.  The parties are**

**reminded that objections must be both timely and specific to trigger de novo review by the**

**district court.**

DATED this 16th day of February 2007.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)